UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LATOYA LASHON BURDINE,<br><br>    Plaintiff,<br><br>    v.<br><br>ANDREW SAUL, Commissioner of Social Security,<br><br>    Defendant. | No. 1:19-cv-00518-GSA<br><br>**ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF COMMISSIONER OF SOCIAL SECURITY AND AGAINST PLAINTIFF** |

### I.     Introduction

Plaintiff LaToya Lashon Burdine ("Plaintiff") seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability insurance benefits pursuant to Title II, and supplemental security income pursuant to Title XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs which were submitted without oral argument to the Honorable Gary S. Austin, United States Magistrate Judge.[1] *See* Docs. 15, 17 and 18. Having reviewed the record as a whole, the Court finds that the ALJ's decision is supported by substantial evidence and applicable law. Accordingly, Plaintiff's appeal is denied.

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. *See* Docs. 7 and 8.

1

**II.     Procedural Background**

On November 17, 2014, Plaintiff filed applications for disability insurance benefits and supplemental security income alleging disability beginning November 4, 2014. AR 15. The Commissioner denied the application initially on August 12, 2015, and following reconsideration on March 24, 2016. AR 15.

On May 31, 2016, Plaintiff filed a request for a hearing. AR 15. Administrative Law Judge Sharon L. Madsen presided over an administrative hearing on March 1, 2018. AR 35-59. Plaintiff appeared and was represented by an attorney. AR 35. On April 18, 2018, the ALJ denied Plaintiff's application. AR 15-30.

The Appeals Council denied review on February 14, 2019. AR 1-6. On April 22, 2019, Plaintiff filed a complaint in this Court. Doc. 1.

**III.    Factual Background**

    **A. Cessation of Prior Work**

Plaintiff (born July 1981) voluntarily stopped working in August 2012 to return to school. AR 206, 1319. When Plaintiff became pregnant in 2013, she decided to stay home with her children. AR 496, 1319.

    **B    Medical Records**

The record includes Plaintiff's treatment notes from April 2014 through October 2017 at Adventist Medical Center—Hanford. AR 300-408, 425-70, 522-1025. In April 2015, Plaintiff's diagnoses included alcohol abuse, borderline personality disorder, central obesity, smoker, depression, fatigue and malaise.. AR 308. Plaintiff also experienced a mood disorder subsumed in her other diagnoses. AR 308.

Plaintiff's obesity was a chronic problem. Medical records document her height as 5'4" to 5'6", and weight ranging from 211 to 239 pounds. *See, e.g.,* AR 395, 402, 404, 663, 680, 695. In April 2014, her physician noted that Plaintiff's history of chronic weight gain was worsening. AR 404. In July 2014, Plaintiff's doctor noted her poor response to treatment. AR 392. Treatment records consistently note Plaintiff's poor compliance with her diet and exercise

///

regimens, medication and self-monitoring. *See, e.g.,* AR 355, 365, 370, 375, 404, 425, 429, 439, 447, 457, 689, 903.

In May 2014, Plaintiff complained that her upper and lower back were "tight," but denied radiating pain or numbness. AR 338. Her doctor prescribed Baclofen[2] for Plaintiff's back spasms.[3] AR 375. Plaintiff also experienced asthma which the record generally noted as stable with medications and occasional exacerbations. In April 2015 and August 2016 chest x-rays revealed normal heart, lungs and thoracic spine. AR 546, 604.

After drinking alcoholic beverages in November 2014, Plaintiff was treated in the Adventist Health emergency department for suicidal ideation. AR 1047. Thereafter, Plaintiff received biweekly mental health treatment at Adventist Health. AR 434, 483, 1041. Her initial mental health diagnosis was (1) bipolar I disorder, most recent episode depressed, severe without psychotic features, and (2) major depressive disorder, recurrent, severe without psychotic features. AR 1045.

Following her hospitalization, Plaintiff received psychiatric medication services at Adventist Health from Ralph P. Lissaur, M.D., Julianna Yates, PA-C, and Jacob Ayuen, PA-C. The record includes treatment notes from November 2014 through December 2017. AR 1316-97. In December 2014, Ms. Yates noted that Plaintiff, who had been diagnosed with depression four years earlier, had experienced mood swings in the past six months related to relationship difficulties. AR 1319. Plaintiff attributed her depression to the effects of a 2011 medical abortion. AR 1316. Plaintiff was smoking cigars and consuming 3 servings of hard liquor three times weekly and 12-14 (ounces?) of wine three times daily. AR 1319. From January 2015 to December 2017, Plaintiff "reduced" her alcohol consumption to two servings of hard liquor daily. AR 1327, 1355.

In or about Fall 2015, Helen Machado, L.C.S.W., Plaintiff's counselor at Adventist Health, referred Plaintiff to Kings View (Kings County Mental Health) for medication

---

[2] Baclofen is a skeletal muscle relaxant used to treat muscle stiffness and tightness. Medlineplus.gov/drug info/meds/a682430.html (accessed July 20, 2020).

[3] Plaintiff also took Norco prescribed for others without disclosing that to her physician. AR 477.

3

management.[4]  AR 434, 476.  Treatment records from Kings View appear in the record at AR 476-512, 1026-39.

Following an intake interview, Kings View psychiatrist Mircea Truta, M.D., diagnosed Plaintiff as follows:

> Axis I:      Major Depressive Disorder severe, without psychotic features
> Anxiety Disorder Not Otherwise Specified
> Alcohol Use Disorder in remission
>
> Axis II:     Unspecified Personality Disorder—Borderline Traits
>
> Axis III:    Asthma, obesity, GERD
>
> Axis IV:     Social environment and occupational problems
>
> Axis V:      Current GAF = 60

AR 483.[5]

In June 2015, Plaintiff was treated in the Adventist Medical Center emergency department for a head injury sustained when she fell backward while bowling.  AR 657-666.  Hospital personnel observed no contusion, laceration or hematoma.  AR 663.  Because her pain was gone, Plaintiff declined a CAT scan of her head but requested medication in case the pain returned.  AR 663. The treating physician prescribed Norco, Flexeril and Ibuprofen.  AR 664.

In November 2015, Plaintiff reported hearing voices telling her to kill herself, paranoid delusions that others were talking about her, and frequent panic attacks.  AR 502, 506.  In December 2015, Plaintiff told Ms. Machado that she shoplifted at a store that she knew did not have security cameras and felt good about having items in her purse without having spent her

---

[4] The record does not explain why Ms. Machado would refer Plaintiff, who was already receiving psychiatric treatment at Adventist Health, to a psychiatrist not affiliated with Adventist Health.

[5] The Global Assessment of Functioning (GAF) scale is a rating from 0 to 100 and considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. *Diagnostic and Statistical Manual of Mental Disorders*, 32-35 (4th ed. American Psychiatric Association 1994). A GAF of 51-60 corresponds to moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id*.

money. AR 1126. Plaintiff agreed with Ms. Machado that Plaintiff was bored and the shoplifting gave her a rush. AR 1126. Plaintiff acknowledged that she was bored staying home with her children day after day but told Ms. Machado that she did not want to work because earning money would reduce her rent assistance. AR 1126-27. In her treatment notes Ms. Machado characterized Plaintiff as headstrong and unwilling to change. AR 1128.

In December 2015, following an argument with her boyfriend, Plaintiff used a knife to inflict a superficial cut that did not require stitches. AR 510, 1027, 1132. Ms. Machado determined that Plaintiff was a danger to herself or others and arranged for emergency treatment on a 5150 hold. AR 1132. Before the ambulance arrived to transport Plaintiff to the hospital, she left the clinic. AR 1134. A former boyfriend, who was caring for Plaintiff's children, escorted her back to the clinic later for transport to the hospital, AR 1134.

In January 2016, Plaintiff complained of left foot pain. X-rays were normal. AR 1024.

In February 2016, Plaintiff declined further services from Kings View. AR 1038. Plaintiff told Ms. Machado that Dr. Truta was invasive and asked too many questions. AR 1153. Plaintiff reported that she was doing much better on her medications. AR 1160.

In June 2016, Plaintiff reported that her medications were not working well for her. AR 1211. At about the same time Plaintiff experienced financial and relationship difficulties. AR 1211.

In August 2016, on direction of her therapist, Plaintiff was seen in the Adventist Medical Center emergency department for depression and suicidal thoughts. AR 547-50, 556., 1241-43 Robert Ginther, PA-C, noted that stress at home had increased Plaintiff's depression, but she had no suicidal plan. AR 550, 551. Plaintiff was stable throughout her six-hour stay in the emergency department and was released to go home. AR 554. Upon follow-up contact by Kings

///

View staff, Plaintiff declined further services stating that she preferred to receive medications from her primary care physician.  AR 1035.

Kings View administratively discharged Plaintiff from treatment in November 2016, noting that Plaintiff showed minimal improvement.  AR 1026.  Her discharge diagnosis included major depressive disorder, recurrent, severe with psychotic symptoms; panic disorder without agoraphobia; borderline personality disorder; problems related to unwanted pregnancy; and, other problems related to psychosocial circumstances.  AR 1026.

In January 2017, neurologist Michael Medelros, M.D., examined Plaintiff and ruled out carpal tunnel syndrome as a cause of her arm and hand pain.  AR 1015-17.  Plaintiff refused the EMG portion of the study.  AR 1015.

In December 2017, despite attributing her mental health difficulties to her 2011 elective abortion, Plaintiff again elected to terminate an unwanted pregnancy using medication to induce miscarriage.  AR 1372.

## B. Plaintiff's Testimony

At the time of the March 2018 hearing, Plaintiff lived in an apartment with her four children, who ranged in age from three to seventeen years old.  AR 41.  She experienced pain in her hands and lower back pain "now and then" that limited her ability to walk.  AR 45.  Plaintiff's doctors prescribed baclofen for her back pain but advised her to live with her hand pain.  AR 46.  Plaintiff had declined EMG testing of her hands to avoid having the needles inserted.  AR 53.  She took prescription medications for her mental health impairments.  AR 46.

Plaintiff could stand for one-half hour and walk one mile.  AR 47.  She could sit for about one-half hour before experiencing back pain.  AR 47.  When her back was sore, Plaintiff had difficulty bending to lift things off the floor.  AR 47.

///

Plaintiff completed high school and some college, and earned a medical assistant certificate.[6] AR 42. She had a driver's license and was able to drive. AR 42. Plaintiff had worked as a medical assistant and as a retail cashier and stock clerk. AR 44. She could pay attention and handle her own finances. AR 48. Although Plaintiff could type, she found it painful. AR 54.

Plaintiff was able to perform her own personal care. AR 42. She was able to do household chores, shop for groceries and cook in a microwave oven. AR 42. She could lift her youngest child but could not lift grocery bags. AR 46.

Plaintiff participated in her children's activities but had no personal social activities. AR 42-43. On a typical day, Plaintiff awoke at 6:00 a.m., helped her children prepare and took them to school. AR 43. After returning home, she returned to bed for the day to nap, watch television, talk on the phone, listen to music and peruse social media. AR 43.

Plaintiff experienced bipolar disorder, depression, anxiety and changes in mood. AR 47, 52-53. Her depression caused her to isolate herself, cry and sometimes feel suicidal. AR 48. She experienced difficulty interacting with others, becoming irritated or angry. AR 49. Plaintiff had lashed out at individuals with whom she had professional relationships, such as doctors and teachers. AR 51.

Although Plaintiff had previously had a drinking problem, she was doing better at the time of the hearing, testifying that she drank only once or twice weekly. AR 49. She smoked marijuana regularly. AR 49.

///

///

---

[6] Several treating professionals reported that Plaintiff had completed a master's degree (M.A.). Nothing in the record supports that conclusion. The Court suggests that these individual's misinterpreted Plaintiff's completion of a medical assistant program, commonly abbreviated as M.A.

### IV.     Standard of Review

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

### V.     The Disability Standard

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot,

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled. 20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f).

## VI.     **Summary of the ALJ's Decision**

The Administrative Law Judge found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of November 4, 2014. AR 18. Her severe impairments included intermittent explosive disorder, mood disorder, major depressive disorder, panic disorder, borderline personality disorder, and drug (cannabis) and alcohol abuse. AR 18. None of the severe impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). AR 19.

The ALJ concluded that Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels, but was restricted to simple routine tasks and occasional public contact. AR 21. Plaintiff was not able to perform any of her past relevant work. AR 27-28. However, considering Plaintiff's age, education, work experience and residual functional capacity, there were jobs available in significant numbers in the national economy that Plaintiff could perform. AR 28. Accordingly, the ALJ found that Plaintiff was not disabled at any time

from November 4, 2014, the alleged disability onset date, through April 18, 2018, the date of the decision.  AR 29-30.

### VII.     Sufficient Evidence Supported the ALJ's Determination at Step Four

Focusing on her alleged mental health impairments, Plaintiff contends that the ALJ erred in rejecting the consultative opinions of Drs. Hirokawa and Portnoff in favor of her own medical conclusions. Plaintiff adds that the ALJ improperly evaluated Ms. Machado's opinion.  The Commissioner counters that substantial evidence in the record supported the ALJ's determination of Plaintiff's residual functional capacity and that the ALJ appropriately applied the medical evidence to determine Plaintiff's residual functional capacity. .

#### A.  Medical Opinions

##### 1.  Agency Physicians

In the course of initial review in August 2015, surgeon W. Jackson, M.D., opined that Plaintiff had mild back pain that would not significantly affect her functional abilities.  AR 65. According to the administrative record, Plaintiff had no imaging of her back but was able to walk a mile, care for her children, drive and care for her home.  AR 65.  Plaintiff had no exertional, postural, manipulative or visual limitations, and no other environmental limitations.  AR 67-68. However, because Plaintiff had asthma for which she received medication and had required occasional emergency treatment, Dr. Jackson determined that Plaintiff's residual functional capacity should include asthma precautions.  AR 65, 68.

Psychiatrist A. Garcia, M.D., found Plaintiff's allegations of mental health problems to be partially credible.  AR 65.  Although diagnosed with depression and anxiety, Plaintiff was able to care for four children, do housework, cook, socialize and manage money.  AR 65.  Plaintiff's mental impairments were treated with medication.  AR 65.  Dr. Garcia opined that Plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence and pace; and, no episodes of decompensation of extended duration.  AR 66.  Plaintiff had no limitations attributable to her mental health impairments except that her ability to carry out detailed instructions was moderately limited.  AR 69-70.

On reconsideration, the agency considered new evidence including Plaintiff's hospital admission for suicidal ideation and positive testing for benzodiazepines, opiates and cannabis. AR 96. After reviewing the record, Psychologist Joshua D. Schwartz, Ph.D., agreed with Dr. Garcia's assessment. AR 96. Dr. Schwartz emphasized Plaintiff's delayed responses and minimal effort on cognitive portions of the mental health examination. AR 96.

### 2. Consultative Psychological Examination: Dr. Hirokawa

In July 2015, Greg Hirokawa, Ph.D., conducted a comprehensive psychological examination. AR 415-19. Plaintiff told Dr. Hirokawa that following an abortion five years earlier, she experienced feelings of guilt, irritability and mood swings. AR 415. Plaintiff also complained of depression, anxiety, bipolar (*sic*), poor sleep and poor concentration. AR 415. Her current medications were Prozac,[7] Omeprazole,[8] Baclofen and Seroquel.[9] AR 416. Plaintiff had used alcohol since age 16. AR 416. She denied using other drugs. AR 416.

Plaintiff previously worked as a medical assistant. AR 416. She had a fair relationship with her co-workers despite arguing with them. AR 416. She had a previous arrest for assault. AR 416.

On a typical day, Plaintiff awoke at 10:00 a.m. and got ready for the gym. AR 417. She cleaned her home (vacuuming, sweeping, mopping laundry, and trash removal) and prepared dinner. AR 417. She tried to relax and enjoyed reading and television. AR 417. Plaintiff had few friends. AR 417.

Dr. Hirokawa administered the Wechsler Adult Intelligence Scale (WAIS IV) and the Wechsler Memory Scale IV flexible approach. AR 417. Plaintiff 's full scale intelligence score was 79. AR 417-18. Her WMS IV (flexible approach) scores were 73, verbal and 69, visual. AR 418. The doctor reported that Plaintiff's participation, effort and overall communication skills

///

---

[7] Prozac (Fluoxetine) is prescribed to treat depression, obsessive-compulsive disorder, panic attacks and some eating disorders, as well as mood swings and irritability associated with symptoms of premenstrual disorder. Medlineplus.gov/druginfo/meds/a689006.html (accessed June 20, 2020).

[8] Omeprazole is used alone or with other medications to treat gastro-esophageal reflux disease (GERD). Medlineplus.gov/druginfo/meds/a693.050.html (accessed July 20, 2020).

[9] Serroquel (Quetiapine) is an antipsychotic prescribed to treat symptoms schizophrenia and bipolar disorder. Medlineplus.gov/druginfo/meds/a690019 (accessed July 20, 2020).

were fair.  AR 418.  Symptoms of anxiety and depression were in the moderate range.  AR 418.  Plaintiff demonstrated low average intelligence.  AR 418.

In Dr. Hirokawa's opinion, Plaintiff had mild impairment of her ability to follow simple instructions; maintain adequate pace and persistence to perform simple or complex tasks; maintain adequate attention and concentration; accept criticism from a supervisor and respond appropriately; demonstrate social judgment and awareness of socially appropriate behavior; and, function independently and sustain an ordinary routine without special supervision.  AR 419.  Plaintiff was moderately impaired in her ability to follow complex or detailed instructions; adapt to changes in job routine; withstand the stress of a normal workday; and, regularly interact appropriately with co-workers, supervisors and the general public.  AR 418.  Plaintiff was moderately likely to deteriorate emotionally in a work environment.  R 419.

### 3. Consultative Psychological Examination: Dr. Portnoff

In February 2016, psychologist Lance A. Portnoff, Ph.D., conducted a second psychiatric evaluation of Plaintiff.  AR 515-19.  Plaintiff displayed mild psychomotor slowing and moderately reduced facial kinetics.  AR 517.  Current medications included Depakote,[10] Prozac, Hydroxyzine (an antihistamine for skin rash), Seroquel, Baclofen, a birth control pill, Phentermine (weight loss) and Nexium.  AR 516.  Although Plaintiff had a history of alcohol abuse she told the doctor that she now consumed only two cocktails weekly.  AR 516.

Dr. Portnoff diagnosed major depressive disorder, recurrent, moderate to severe; post-traumatic stress disorder; and, alcohol use disorder in partial remission.  AR 518.  In the doctor's opinion Plaintiff's prognosis was fair, depending upon continued access and response to psychotropic drug treatment and abstinence from substances.  AR 518.  Plaintiff had mild limitation of her ability to perform detailed and complex tasks.  AR 518.  She had moderate limitation of her ability to interact with co-workers and the public.  R 518.  Plaintiff had mild to moderate limitation of her ability to maintain regular workplace attendance.  AR 519.  She had moderate to marked limitation of her ability to complete a workday or workweek without

---

[10] Depakote (Valproic Acid) is used to treat manic symptoms in individuals with bipolar disorder.  Medlineplus/druginfo/meds/a682412.html  (accessed July 20, 2020).

interruptions due to psychiatric symptoms and to deal with the stress encountered in a competitive work environment.  AR 519.

### 4. Mental Medical Source Statement

In July 2016, Plaintiff's therapist, Helen Machado, L.C.S.W., completed a mental medical source statement form.  AR 520-21.  Ms. Machado opined that except for adhering to standards of neatness and cleanliness, Plaintiff's impairments resulted in her lacking the mental abilities and aptitudes to perform full-time unskilled work.  AR 520-21.  At least ten percent of the workday Plaintiff would be unable to: remember work-like procedures; understand, remember and carry out very short and simple instructions; ask simple questions or request assistance; and, maintain attention for a two-hour segment.  AR 520.  At least fifteen percent of the workday Plaintiff would be unable to: maintain regular attendance and be punctual within customary, usual tolerances; sustain a normal routine without special supervision; work in coordination with or proximity to others without being unduly distracted; make simple, work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instruction and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; deal with normal work stress; be aware of normal hazards and take appropriate precautions; understand, remember and carry out detailed instructions; set realistic goals or make plans independently of others; deal with stress of semiskilled and skilled work; interact appropriately with the general public; maintain socially appropriate behavior; travel in unfamiliar places; and, use public transportation.  AR 520-21.

Checking off form responses, Ms. Machado indicated that Plaintiff would be absent from work more than four days per month.  AR 521.  She could manage her finances in her own best interest.  AR 521.  Plaintiff had a medical marijuana card.  AR 521.

### B. Determining Residual Functional Capacity

"Residual functional capacity is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."

SSR 96-8p. The residual functional capacity assessment considers only functional limitations and restrictions which result from an individual's medically determinable impairment or combination of impairments. SSR 96-8p.

A determination of residual functional capacity is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner. See 20 C.F.R. §§ 404.1527(d)(2) (RFC is not a medical opinion), 404.1546(c) (identifying the ALJ as responsible for determining RFC). "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001). In doing so the ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995).

"In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins*, 466 F.3d at 883. *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

The opinions of treating physicians, examining physicians, and non-examining physicians are entitled to varying weight in residual functional capacity determinations. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. *Id.*; *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996). The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990). An ALJ may reject an uncontradicted opinion of a treating or examining medical physician only for clear and convincing reasons. *Lester*, 81 F.3d at 831. In contrast, a contradicted opinion of a treating physician may be rejected for specific and legitimate reasons. *Id.* at 830. However, the opinions of a treating or examining physician are

"not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999). In this case, the record includes no opinion from any of Plaintiff's treating physicians.

Of the many professionals who treated Plaintiff, only Ms. Machado provided a medical source statement. Licensed clinical social workers (L.C.S.W.) such as Ms. Machado are not evaluated as if they were physicians. A social worker is not considered an acceptable medical source.[11] *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 2017 WL 168819 (Jan. 18, 2017). Unlike the opinions of physicians, the opinions of licensed clinical social workers and others not categorized as acceptable medical sources are not entitled to special weight. 20 C.F.R. § 404.1527(f). An ALJ may reject the opinions of other sources by giving "reasons germane to each witness for doing so." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012); *Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 (9th Cir. 2010).

### C.     The ALJ Properly Analyzed Evidence in the Record as a Whole

"[A]n ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes*, 881 F.2d at 750. An ALJ may choose to give more weight to opinions that are more consistent with the evidence in the record. 20 C.F.R. §§ 404.1527(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion").

Because of its inconsistency with objective evidence in the record, Plaintiff's testimony that her impairments prevented her from performing any work was not fully reliable. AR 23. Plaintiff herself testified that her mental health treatment had helped her and that the medications prescribed for her improved her condition, sleep and ability to care for her children. AR 23. Plaintiff described her ability to get her children up and ready for school, go grocery shopping

---

[11] The Social Security Administration adopted new rules applicable to claims filed after March 27, 2017, which expanded the category of acceptable medical providers to include some, but not all, previously unacceptable treating providers as acceptable medical sources. 20 C.F.R. §§ 404.1502(a)(6), (7), (8); 416.902(a)(6), (7), (8) (2017); Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017). Acceptable medical sources do not include licensed clinical social workers either before or after these rule revisions. *Id.* In any event, the 2017 revisions do not apply to Plaintiff's claims, which were filed November 17, 2014.

and participate in her children's activities. AR 23. She was able to perform her own personal care and demonstrated adequate grooming and attire. AR 23. Although Plaintiff testified that she ultimately tired of watching television, the record consistently reported adequate concentration and attention during conversations and appointments. AR 23.

Nonetheless, the ALJ acknowledged that Plaintiff's medications improved her depression and anxiety but did not completely eliminate her symptoms. AR 23. The medication did not affect Plaintiff's mood swings. AR 23. As a result, Plaintiff continued to become irritated and lash out at others, overreact with mood changes and tolerate frustration poorly. AR 23. Accordingly, the ALJ limited Plaintiff's residual functional capacity to simple routine tasks and limited public contact to minimize Plaintiff's stress and frustration and to accommodate fluctuations in attention and memory. AR 23.

Finding Drs. Schwartz and Garcia's opinions to be mostly consistent with the evidence of record, the ALJ gave other portions of their opinions only partial weight. AR 24. The ALJ acknowledged that in their opinions Plaintiff could understand and remember simple one-to-two step instructions; sustain concentration, persistence and pace for simple tasks in the course of an eight-hour workday; interact appropriately with the public, coworkers and supervisors; and, adapt to simple changes in the workplace. AR 24. Because the evidence as a whole indicated that Plaintiff experienced mood swings and overreacted to frustrating situations, the ALJ limited Plaintiff to occasional public contact. AR 24. The ALJ gave great weight to the agency psychologists' opinions that Plaintiff had good immediate memory, could perform three-step commands, perform simple repetitive tasks and could appropriately interact with coworkers and supervisors. AR 24.

The ALJ also gave partial weight to Drs. Jackson and Gilpeer's opinions that Plaintiff required environmental limitations due to her asthma in light of evidence in the record as a whole that Plaintiff's lungs were generally clear; breath sounds were unlabored; and, Plaintiff generally did not experience shortness of breath. R 24. She gave great weight to their opinions that Plaintiff had no exertional, positional or manipulative limitations finding that the record well

///

established that Plaintiff had no tenderness or deformity of the musculoskeletal system, normal strength and normal range of motion in her back and extremities. AR 24.

As with the other expert opinions, the ALJ gave partial weight to Dr. Hirokawa's opinion that Plaintiff's ability to interact with co-workers and supervisors was moderately limited, contrasting it with other evidence in the record indicating that Plaintiff had good relationships with friends and was cooperative with her medical providers. AR 24-25. Otherwise, the ALJ gave Dr. Hirokawa's opinion great weight. AR 25.

The ALJ similarly gave partial weight to Dr. Portnoff's opinion that Plaintiff experienced limitations in interpersonal relationships and in her ability to deal with the stress of the workplace, contrasting those opinions with other evidence of Plaintiff's ability to function. AR 25. "Despite her impairments, [Plaintiff] was able to remain at home to care for her children, including waking them up for school on a daily basis, indicating an ability to complete normal days and weeks, even in a stressful environment." AR 25. The ALJ gave great weight to those portions of Dr. Portnoff's opinion that she found to be consistent with the record as a whole including Plaintiff's good memory, less reliable long-term memory, and performance of simple three-step commands. AR 26.

The ALJ analyzed Ms. Machado's medical source statement following the pattern she had established with each prior opinion. Because Plaintiff contends that the ALJ failed fairly to consider Ms. Machado's opinions, the Court sets forth the ALJ's analysis in full:

> Helen Machado, licensed clinical social worker, provided a mental medical source statement for the claimant. Ms. Machado opined that the claimant's mental abilities and aptitudes for unskilled work would be precluded for 10% to 15% or more of the workday. She further concluded the claimant's mental abilities and aptitudes to do semiskilled or skilled work and to do particular types of jobs would be precluded for 15% or more of the workday. However, she specified that the claimant would not be precluded in her ability to adhere to basic standards of neatness or cleanliness. Ms. Machado opined the claimant would be absent more than four days per month, and that the claimant's substance abuse did not contribute to the claimant's limitations. The opinion is given partial weight because it is only somewhat consistent with the record.

///

> Ms. Machado's opinion that the claimant would be off task for

> unskilled work and would be absent more than four days per month is given little weight. First, a licensed clinical social worker is not an acceptable medical source (20 CFR 404.1527 and 416.927). Second, Ms. Machado's opinion is not supported by evidence in the record. The claimant had good immediate memory being able to remember three of three unrelated words immediately but struggled with retention after a short delay, but the claimant could perform a simple three-step command. Therefore, the claimant could perform simple repetitive tasks such as those involved in unskilled work.
>
> The remainder of Ms. Machado's opinion is given great weight because it is generally consistent with the evidence in the record. For example, the claimant was independent in her bathing, dressing and grooming and attended appointments with clean grooming and appropriate attire. Therefore, the claimant did adhere to basic standards of neatness. Additionally, despite good immediate memory, the claimant struggled with retention after a short delay and had only borderline visual and verbal memory, so the claimant should not work with complex or detailed tasks.

AR 26 (citations to administrative record omitted).

Noting that the ALJ repeatedly pointed to certain examples of Plaintiff's day-to day functioning in her analysis of the various expert opinions, Plaintiff contends that the ALJ improperly selected only evidence to support her determination. Plaintiff is correct that an ALJ is not permitted to "cherry-pick" from mixed results to establish a conclusion based only on the evidence that supports a denial of benefits. *Garrison v. Colvin*, 759 F.3d 995, 1017 n. 23 (9th Cir. 2014). An ALJ's focusing only on those aspects of the physician's opinion that tend to support a finding of non-disability does not satisfy the requirement of *legitimate* reasons. *Edlund v. Massanari*, 253 F.3d 1152, 1159 (9th Cir. 2001). In this case, however, the ALJ did not cherry pick evidence to support a conclusion. Instead, she consistently rejected those portions of the experts' opinions that were inconsistent with reliable and persuasive evidence of record concerning Plaintiff's short- and long-term memory, ability to perform simple tasks, and strengths and limitations in Plaintiff's interpersonal relationships. In short, the ALJ fulfilled her role by determining credibility, resolving conflicts in medical testimony and resolving evidentiary ambiguities (*Andrews*, 53 F.3d at 1039-40); "considering all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment" (*Robbins*, 466 F.3d at 883); and, "setting out a detailed and thorough summary of the facts and conflicting evidence, stating her interpretation

thereof, and making findings" (*Magallanes*, 881 F.2d at 751).

In assessing her own residual functional capacity, Plaintiff would interpret her symptoms and treatment differently. The Court is not required to accept Plaintiff's characterization of her treatment records or the severity of her impairments. The ALJ fully supported her determination based on the medical opinions and the evidence of record. Even if this Court were to accept that the record could support Plaintiff's opinion, the record amply supports the ALJ's interpretation as well. When the evidence could arguably support two interpretations, the Court may not substitute its judgment for that of the Commissioner. *Jamerson*, 112 F.3d at 1066.

### IX.    Conclusion and Order

Based on the foregoing, the Court finds that the ALJ's decision that Plaintiff is not disabled is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is directed to enter judgment in favor of Defendant Andrew Saul, Commissioner of Social Security, and against Plaintiff LaToya Lashon Burdine.

IT IS SO ORDERED.

  Dated:   **July 28, 2020**                              **/s/ Gary S. Austin**
                                                  UNITED STATES MAGISTRATE JUDGE